## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Apr 30 2019, 11:05 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Deborah Markisohn
Marion County Public Defender
Agency, Appellate Division
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Benjamin J. Shoptaw
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

N.F.,
*Appellant*,

v.

State of Indiana,
*Appellee*.

April 30, 2019

Court of Appeals Case No.
18A-JV-2655

Appeal from the Marion Superior Court

The Honorable Marilyn A. Moores, Judge

The Honorable Gary Chavers, Magistrate

Trial Court Cause No.
49D09-1807-JD-854

**Brown, Judge.**

[1] N.F. appeals the juvenile court's disposition of his case following a determination that he is a juvenile delinquent. N.F. raises one issue which we revise and restate as whether the court committed fundamental error by failing to specifically ask him whether he wanted to address the court to make a statement in allocution at the dispositional hearing. We affirm.

### Facts and Procedural History

[2] N.F., who was born in October 2000, was in a dating relationship with L.P. and resided with her. On July 25, 2018, N.F. and L.P. argued, and N.F. broke L.P.'s cell phone and slapped her which caused L.P. to feel pain. The State alleged N.F. to be a delinquent child for acts constituting the following crimes if committed by an adult: Count I, domestic battery as a class A misdemeanor; Count II, battery resulting in bodily injury as a class A misdemeanor; and Count III, criminal mischief as a class B misdemeanor.

[3] On August 22, 2018, the court held a hearing, N.F.'s counsel indicated that N.F. would enter admissions to Counts I, II, and III, and N.F. admitted the allegations. The court found a sufficient factual basis to adjudicate N.F. to be a delinquent child. His mother stated that he had a "violent history," had placed his hands on her several times, "gets very angry," and that she "actually emailed Probation about thirty pages of run ins that we've had with the law since mid October 2015." Transcript Volume II at 12-13. She also stated that she told N.F., "One of these days, I'm going to either wake up in the hospital,

or my three kids are going to wake up without a mom." *Id.* at 13. The court ordered a psychological evaluation of N.F.

[4] In a pre-dispositional report filed on September 17, 2018, the probation officer indicated that N.F. stated:

> I feel bad about it. I made a bad decision. I had a job. What I would want to happen is to go home to mom, finish high school and get a job. If that is not possible I would prefer to go to placement over the Department of Corrections. I would be open to group home. I will be 18 soon and would like help to be on my own. I would also like house arrest. I just want to get out of trouble. I just want to do what I can to finish high school. I want to be a Welder. I want to get out to start this.

Appellant's Appendix Volume II at 89. The report indicated that N.F.'s mother stated that N.F. had been violent towards her since around the age of 14, and that, when he was residing with her, she and her daughter would sleep with their door locked because they were afraid of him. The report stated that N.F.'s mother was in the military and was currently re-enlisting, that he had not lived with his mother for a very long time, and that he stated that he did not have a good relationship with his mother and her boyfriend and had physical altercations with his mother's boyfriend. N.F.'s overall risk assessment score places him in the high risk to reoffend category. The report also indicated that probation recommended that he be released to his mother's care.

[5] On September 26, 2018, the court held a dispositional hearing. N.F.'s counsel asserted that his aunt was willing to have him in her household, that the case

did not involve a serious injury, that he had been detained for two months already was five credits away from graduating from Warren Central High School, and that he did not have a serious history of true findings.

[6] N.F.'s mother testified that she did not want him in her home, that he always had a great relationship with his aunt,[1] and that she was worried about the safety of his younger sister. Amber Keegan testified that she and N.F.'s mother had been best friends for about fifteen years, that she has four children, that he would have to know he has to go to school, that he could sleep on the couch, and that he had never threatened her or her children. Upon questioning by N.F.'s counsel, Keegan stated that N.F. had always been very respectful and behaved. Upon questioning by the prosecutor, Keegan stated that she was aware that N.F. had been violent with his mother.

[7] The court took a recess and then indicated that it had a brief conference and that it was the court's position that the matter needed to be continued to give N.F.'s counsel more time to "put together . . . a potential plan." Transcript Volume II at 27. N.F.'s counsel asked: "Perhaps as a test option . . . releasing him to Ms. Keegan on Electronic Monitor and on GPS unit for the time being for the week?" *Id.* at 30. The court denied the request.

---

[1] When asked if she and the aunt were sisters, N.F.'s mother stated: "Not biologically, your Honor." Transcript Volume II at 23.

[8]     On October 4, 2018, the court held a hearing at which N.F.'s counsel mentioned that N.F. had one prior misdemeanor in Hamilton County, that he had been in detention for seventy days, that no serious injury was involved, and that he was five credits away from graduating. He requested probation with community-based services and placement in Keegan's home. He also stated:

> I want the Court to be aware however, that if the Court were to reject that . . ., [N.F.] is fully prepared to cooperate and take full advantage of a placement at Fairbanks. [H]e recognizes that he has . . . demonstrated substance abuse issues in the past, and that those play a certain part . . . in the behaviors that have gotten him in trouble here today.

*Id.* at 33. He also stated the Department of Correction ("DOC") "is . . . way out line [sic] with what's typical and what is required for this." *Id.* N.F.'s mother stated that "last time when I spoke to [N.F.], I was able to see changes, but I said he's very manipulative too. He can pull the wools [sic] over my eyes, but I'm hoping that that's not the case . . . ." *Id.* at 38. Keegan stated in part that N.F.'s mother mentioned Fairbanks to her and: "I kind of agree with Fairbanks." *Id.* at 39. The prosecutor stated that the DOC "is the only option at this point," mentioned the concern that Keegan has four children in her home, and stated that she was unsure that thirty days in Fairbanks would be sufficient for "him to get on the right track." *Id.* at 40.

[9]     After a recess, the court informed N.F. that it was going to reset the hearing for the following day and that it was not going to send him straight home or straight to Keegan, and he indicated that he understood. The court asked N.F.

if he turned eighteen on Monday, and he responded affirmatively. The court also asked N.F.'s counsel, "[I]s there anything else you would want on the record?" *Id.* at 42.

[10] On October 5, 2018, the court held a hearing at which the following exchange occurred:

> THE COURT: . . . The Court is now ready to issue a ruling. I do want to give the opportunity, State anything else you want to add today?
>
> [Prosecutor]: Nothing Judge.
>
> THE COURT: [N.F.'s Counsel]?
>
> [N.F.'s Counsel]: No Judge.

*Id.* at 44. The court ordered that N.F. be committed to the DOC for placement at a juvenile correctional facility, that the commitment "is up until his twenty-first birthday unless sooner released by the [DOC]," and that the court would make a recommendation of nine months at the DOC. *Id.* The court requested that the DOC consider N.F. for the Logansport Facility for the Cliff Unit, and stated that placement is a decision that would be made by the DOC after the two-week diagnostic at Logansport.

[11] That same day, the court entered a Dispositional Decree on Delinquency which found in part that: N.F. has prior history in another jurisdiction; he had two stays at the Youth Crisis Center in Jacksonville, Florida, including one stay for a burglary arrest; he was on probation in Hamilton County and spent several

months at White's Residential Facility; and Mother stated that he is violent toward her in the home. The order also stated:

> Dr. Jim Dalton completed a psychological evaluation on [N.F.] and found [N.F.] to have a primary diagnosis of polysubstance abuse/dependence and a secondary diagnosis of conduct disorder.

> Dr. Dalton added the following:

>> "It is important to note that while [N.F.] has a very limited history with the Marion Superior Court, his history of maladjustment in other jurisdictions and in his everyday living has been quite severe over the last many years. Interventions of the Court and of treatment professionals have not had significant impact on this youth's behaviors and risks to date. As noted, he is at high risk for maladjustment."

>> "What is known is that residential placement is not likely to produce any long term and sustained change for this young man. He may participate in care during his placement, but his risk is likely to return quickly when discharged. However, a placement may be the only option to consider – and quite honestly, may be the only way that this youth finishes high school, stays away from drugs and gains some vocational skills and directions going forward. He is not likely to do these things if released to the community."

>> "In this regard commitment to the [DOC] may have a chance to have similar impacts – completing a GED, gaining job skills, and being abstinent [from] drug and alcohol abuse. DOC commitment may be considered (if applicable to legally be considered) due to the lack of efficacy of a previous residential placement setting."

"This youth's prognosis is very serious and very concerning. If he does not complete his high school education, does not have a basic vocational skill developed over the next 4 to 6 months, he will be in jail/prison at a young age or may have worse outcomes (e.g. death)."

Appellant's Appendix Volume II at 117.

## *Discussion*

[12] The issue is whether the court committed fundamental error by failing to specifically ask N.F. whether he wanted to address the court to make a statement in allocution at the dispositional hearing. N.F. acknowledges that his counsel did not object to the court's failure to provide him with an opportunity to address the court prior to pronouncing disposition and that this case is reviewed for fundamental error. He asserts the court was required to inform him he had the right to be heard and inquire whether he wished to exercise this right. He argues that, while the court heard from Mother repeatedly and at length, it never heard from him directly. Without citation to authority, N.F. asserts that, "[i]n contrast to the approach taken by a panel of this Court in *D.M.* [*v. State*, 108 N.E.3d 393 (Ind. Ct. App. 2018), *trans. denied*,] consideration of a claim of fundamental error does not involve consideration of the totality of the facts and circumstances." Appellant's Brief at 22.

[13] The State argues that N.F. waived his right to allocution by failing to object and that the court did not commit fundamental error. It contends that almost every analysis of error involves some form of review of the facts and circumstances. The State asserts that N.F.'s counsel argued for a lesser placement than the

DOC at every stage of the dispositional hearing, that he had a history of delinquent and/or violent conduct, and that it is highly unlikely that the juvenile court's ruling would have been swayed by hearing him personally ask the same request as his Mother and counsel.

[14] Fundamental error is an extremely narrow exception to the contemporaneous objection rule that allows a defendant to avoid waiver of an issue. *D.M.*, 108 N.E.3d at 395. Fundamental error occurs when an error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the error deprives a party of fundamental due process. *Id.* The fundamental error exception is available only in egregious circumstances. *Id.*

[15] "In criminal cases involving adults, a defendant's right to offer a statement on his or her behalf before the trial court pronounces sentence is known as the right of allocution, which has been recognized in the common law since at least 1682." *Id.* (quoting *Vicory v. State*, 802 N.E.2d 426, 428 (Ind. 2004)).

[16] "As a general rule, '[t]he standard for determining what due process requires in a particular juvenile proceeding is "fundamental fairness."'" *Id.* (quoting *D.A. v. State*, 967 N.E.2d 59, 64 (Ind. Ct. App. 2012) (quoting *S.L.B. v. State*, 434 N.E.2d 155, 156 (Ind. Ct. App. 1982))). The Legislature has specifically explained who must be allowed to speak at juvenile dispositional hearings as follows:

> (a) The prosecuting attorney or probation department of the juvenile court shall provide notice of the date, time, place, and purpose of the dispositional hearing under this chapter to each:

> (1) party or person for whom a summons is required to be
> issued under IC 31-37-12-2; and
>
> (2) foster parent or other caretaker with whom the child is
> placed for temporary care;
>
> at the time the dispositional hearing is scheduled.
>
> (b) The court shall:
>
> (1) provide a person who is required to be notified under
> subsection (a) an opportunity to be heard; and
>
> (2) allow a person described in subdivision (1) to make
> recommendations to the court;
>
> at the dispositional hearing.

Ind. Code § 31-37-18-1.3.  Ind. Code § 31-37-12-2 requires a juvenile court to issue a summons to the child, the child's parent, guardian, custodian, or guardian ad litem, and "[a]ny other person necessary for the proceedings."

[17] In *D.M.*, we addressed whether a juvenile court committed fundamental error by its failure to specifically ask D.M. whether he wanted to address the court to make a statement in allocution at the dispositional hearing.  108 N.E.3d at 394. We held:

> We find it to be indisputable that the better practice in this case
> would have been for the juvenile court to have specifically asked
> D.M. if he wanted to make a statement before pronouncing
> disposition of the case.  It would not have taken more than a few
> minutes and would have ensured that the court directly heard
> one of the most important perspectives—that of the juvenile.  As
> has been stated in criminal cases, "'The right of allocution is
> minimally invasive of the sentencing proceeding; the requirement

of providing the defendant a few moments of court time is slight.'"

*Id.* at 395 (quoting *Vicory*, 802 N.E.2d at 429 (quoting *United States v. Barnes*, 948 F.2d 325, 331 (7th Cir. 1991))). We stated that the analysis does not end there and that we must look at the totality of the facts and circumstances in determining whether the juvenile court denied D.M. fundamental fairness. *Id.* In light of the arguments of D.M.'s counsel, D.M.'s extensive juvenile record, and D.M.'s proposed probation plan which included living with his mother even though she had previously told probation officers that D.M. had refused to comply with her curfews, we concluded that the juvenile court's failure to specifically ask D.M. if he wanted to make a statement was not a blatant violation of basic principles, did not pose a potential of substantial harm, and did not deprive D.M. of fundamental due process. *Id.* at 396.

[18] The record reveals that N.F.'s counsel argued for alternative placements to the DOC. The record includes an August 2016 order indicating that N.F. was adjudicated a delinquent for an act that would constitute disorderly conduct as a class B misdemeanor if committed by an adult. In March 2017, the court entered an order finding that "[w]hile on probation and receiving services, the information indicates that on multiple occasions (including after release from secure detention) [N.F.] continued to use controlled substances including marijuana and methamphetamine," and ordered that N.F. be placed at White's Residential and Family Services. Appellant's Appendix Volume II at 13. The record includes an Individual Treatment Plan dated September 14, 2017, which

indicates that N.F.'s arrest history includes charges of disorderly conduct, battery, truancy, curfew violation, trespassing, runaway, and probation violation. The Probation Officer's Report of Preliminary Inquiry indicates that N.F. has a prior true finding in Hamilton County for disorderly conduct as a class B misdemeanor from August 2016 and a prior history in Johnson County although he does not have any true findings. N.F. does not specifically challenge the juvenile court's finding that he had prior history in another jurisdiction including burglary, the finding that Mother stated that N.F. is violent toward her in the home, or its findings regarding Dr. Dalton's report. We also note that the pre-dispositional report which was filed on September 17, 2018, included N.F.'s statement, and the juvenile court stated at the September 26, 2018 hearing that it "reviewed the pre-disposition report." Transcript Volume II at 16. Based upon the record and under these particular circumstances, we cannot say that N.F. has established fundamental error.

[19] For the foregoing reasons, we affirm the judgment of the juvenile court.

[20] Affirmed.

May, J., and Mathias, J., concur.